GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
By:    TOMOKO ONOZAWA
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone:  (212) 637-2721
Facsimile:  (212) 637-2686
E-mail:  tomoko.onozawa@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x

UNITED STATES OF AMERICA,

               Plaintiff,

         -against-

MARK FORD, MARK FORD STABLES, INC.,
MARK FORD STAGE ROAD PROPERTY, INC.,
and FORD EQUINE, LTD.,

              Defendants.

---------------------------------------------------------------- x

**COMPLAINT**

19 Civ. 9600

      1.     The United States of America, by its attorney, Geoffrey S. Berman, United States

Attorney for the Southern District of New York, acting on behalf of the Administrator of the

United States Environmental Protection Agency ("EPA"), alleges for its complaint as follows:

**NATURE OF THE ACTION**

      2.     Defendants Mark Ford ("Ford") and Mark Ford Stables, Inc., Mark Ford Stage

Road Property, Inc., and Ford Equine Ltd. (collectively, the "Ford Companies") bulldozed over

two dozen acres of wetlands and rerouted streams while on notice that doing so was prohibited

by the Clean Water Act (the "CWA"), 33 U.S.C. §§ 1251 *et seq.*  Ford and the Ford Companies

did this to build a dedicated horse racing training center with associated pastures on two

properties in Orange County, New York.  As Ford has put it, "you like to have the [horse] track

the way you want it, you want a barn the way you want it and you want some pavement to drive on." To make things "the way [they] want[ed] it," Ford and the Ford Companies illegally filled waters of the United States. They also violated a CWA stormwater construction general permit.

3. Ford and the Ford Companies have repeatedly violated section 301(a) of the CWA, 33 U.S.C. §§ 1311(a), by running a concentrated animal feeding operation without a permit, allowing wastewater to contaminate waters of the United States. These violations—which include piping manure-laden wastewater directly from wash bays/stalls and a horse swimming pool to a nearby stream—continue to the present day.

4. The United States brings this civil action under Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b), (d), to obtain injunctive relief compelling Ford and the Ford Companies to remove the unauthorized fill material from waters of the United States, to restore the watercourses, and to cease their unpermitted discharges, and for civil penalties.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d).

6. Venue is proper in this District pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d) and 1395, because the events giving rise to the claims herein arose in this District.

7. The United States has provided notice of the commencement of this action to the State of New York pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b).

## PARTIES

8.      Plaintiff is the United States of America on behalf of EPA.

9.      Defendant Mark Ford ("Ford") is an individual who owns property and regularly conducts business in Orange County, New York.  Ford is the president and sole shareholder of, and controls, the Ford Companies.

10.      Defendant Mark Ford Stables, Inc., is a corporation organized under the laws of the State of New York, with its principal executive offices located at 410 Jericho Turnpike, Jericho, New York 11753.

11.      Defendant Ford Equine, Ltd., is a corporation organized under the laws of the State of New York, with its principal executive offices located at 125 Stony Ford Road, Campbell Hall, New York 10916.

12.      Defendant Mark Ford Stage Road Property, Inc., is a corporation organized under the laws of the State of New York, with its principal executive offices located at 125 Stony Ford Road, Campbell Hall, New York 10916.

13.      Defendants Ford, Mark Ford Stables, Inc., Ford Equine, Ltd., and Mark Ford Stage Road Property, Inc., are each "persons" within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

## STATUTORY AND REGULATORY BACKGROUND

### I.      The Wetlands Permitting Program Under CWA Section 404

14.      The CWA was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. 1251(a).

15.      Section 301(a) of the CWA, 33 U.S.C. § 1311(a), furthers this goal by prohibiting the "discharge of any pollutant by any person" to waters of the United States, "[e]xcept in

compliance with," among other things, permits issued under Sections 402 and 404 of the CWA. 33 U.S.C. §§ 1342, 1344. The "discharge of a pollutant" includes "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

16. Navigable waters are "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). In turn, "waters of the United States" has been defined to include, *inter alia*, all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce; tributaries to such waters; and wetlands adjacent to the foregoing waters. *See, e.g*., 33 C.F.R. § 328.3(a) (1993); 40 C.F.R. §§ 122.2 (1993).

17. A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container . . . [or] concentrated animal feeding operation . . . from which pollutants may be discharged." 33 U.S.C. § 1362(14).

18. As defined by Section 502(6) of the CWA, a "pollutant" includes, among other things, dredged spoil, solid waste, sewage, biological materials, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste discharged into water. 33 U.S.C. § 1362(6).

19. Wetlands are "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b) (1993).

20. Under the Clean Water Act, no person may discharge fill into wetlands that are waters of the United States (also known as "jurisdictional wetlands") without a permit—typically issued by the United States Army Corps of Engineers (the "Corps of Engineers" or "Corps")— under Section 404(a) of the CWA, 33 U.S.C. § 1344(a). The Section 404 permitting program,

consistent with the purposes of the CWA, is intended to authorize the discharge of dredged or fill material into wetlands only when, among other things, "it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts . . . ."  40 C.F.R. § 230.1.

## II.    The NPDES Permitting Program Under CWA Section 402

21.    Similarly, the Clean Water Act prohibits any person from discharging pollutants other than fill or dredged material to waters of the United States without a permit under Section 402 of the CWA, 33 U.S.C. § 1342(a).  Section 402 authorizes EPA, under certain circumstances, to issue a National Pollutant Discharge Elimination System ("NPDES") permit authorizing a person to discharge pollutants into waters of the United States.  The CWA also authorizes states to establish their own permitting programs.  33 U.S.C. § 1342(b).  After a state's permitting program is approved by EPA, and subject to certain limitations, states may issue their own NPDES permits pursuant to such a program.

22.    New York State, through its Department of Environmental Conservation ("NYSDEC"), administers such an approved permitting program, referred to as the State Pollutant Discharge Elimination System ("SPDES") permit program.  Under Sections 309 and 402(i) of the CWA, the United States retains concurrent authority to enforce SPDES permit violations.  33 U.S.C. §§ 1319, 1342(i).

### A.    Construction General Permits

23.    Construction activity is one type of industrial activity for which associated stormwater discharges require a permit under Section 402 of the CWA.  Construction activity includes "clearing, grading and excavation."  40 C.F.R. § 122.26(b)(14)(x).

5

24.     The CWA regulates stormwater discharges from construction activities because when there is precipitation, stormwater or snowmelt can wash over or flow through loose soil on a construction site and pick up pollutants that are then discharged to rivers, streams, lakes, or coastal waters.

25.     Under 40 C.F.R. §§ 122.26(a)(1)(ii), (b)(14), and (c)(1), dischargers of stormwater associated with industrial activity are required to apply for an individual permit or seek coverage under a promulgated stormwater general permit.

26.     On January 29, 2015, NYSDEC promulgated GP-0-15-002, the SPDES General Permit for Stormwater Discharges from Construction Activity, which is set to expire on January 28, 2020 (the "Construction General Permit").

27.     An owner or operator of a "construction activity," as that term is defined under 40 C.F.R. §§ 122.26(b)(14)(x), 15(i) and 15(ii), must obtain coverage under the Construction General Permit before commencing any construction activities. *See* 40 C.F.R. § 122.21(a)(1); N.Y. Comp. Codes R. & Regs. Tit. 6, § 750-1.4.

28.     To be covered by the Construction General Permit, and pursuant to its terms, an owner or operator of a construction activity must submit a Notice of Intent; prepare and implement a Stormwater Pollution Prevention Plan; conduct inspections; perform maintenance activities; and meet other requirements.

**B.      *Permits for Concentrated Animal Feeding Operations***

29.     An animal feeding operation ("AFO") is defined as a lot or facility (other than an aquatic animal production facility) where (1) animals (other than aquatic animals) have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12-

6

month period, and (2) crops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility.  40 C.F.R. § 122.23(b)(1).

30.　　Animal feeding operations that meet certain specified criteria are referred to as Concentrated Animal Feeding Operations ("CAFOs").  40 C.F.R. § 122.23(b)(2).

31.　　CAFOs can pose a number of risks to water quality and public health, mainly due to the amount of animal manure and "process wastewater" they generate.  Process wastewater is defined as water directly or indirectly used in the operation of the CAFO for any of the following: spillage or overflow from animal water systems; washing, cleaning, or flushing pens, barns, manure pits, or other CAFO facilities; direct contact swimming, washing, or spray cooling of animals; or dust control.  40 C.F.R. § 122.23(b)(7).  Process wastewater also includes any water which comes into contact with any raw materials, products, or byproducts, including manure, litter, feed, or bedding.  *Id.*

32.　　CAFOs are point sources that are subject to the NPDES permit program. 33 U.S.C. § 1362(14); 40 C.F.R. § 122.23(a).

33.　　A "medium CAFO" is defined as an animal feeding operation that (1) stables or confines within the range of 150 to 499 horses, 40 C.F.R. § 122.23(b)(6)(i)(F), and (2) discharges pollutants into waters of the United States, 40 C.F.R. § 122.23(b)(6)(ii).

34.　　"[T]wo or more AFOs under common ownership are considered to be a single AFO for the purposes of determining the number of animals at an operation, if they adjoin each other or if they use a common area or system for the disposal of wastes."  40 C.F.R. § 122.23(b)(2).

35.　　A CAFO may not discharge pollutants to navigable waters unless the discharge is authorized by a Clean Water Act Section 402 permit, including a SPDES permit issued by the

State of New York.  In New York State, to obtain authorization to discharge, a CAFO owner or operator must either apply for an individual SPDES permit ("CAFO Individual Permit") or submit a notice of intent for coverage under a SPDES general permit ("CAFO General Permit").  If the State has not made a CAFO General Permit available, the CAFO owner or operator must apply for a CAFO Individual Permit.  *See* 40 C.F.R. § 122.23(d).

## III.    Enforcement

36.     CWA Section 309(b) and (d) authorizes the commencement of an action for injunctive relief and civil penalties against any person who (among other things) violates CWA Section 301(a) by discharging pollutants to waters of the United States without a permit or who violates the terms of a Clean Water Act permit issued under Section 402.  33 U.S.C. § 1319(b), (d).

37.     Section 309(d) of the CWA, 33 U.S.C. § 1319(d), as modified, provides for a civil penalty of up to $35,000 per day for violations occurring between March 16, 2004, and January 11, 2009; up to $37,500 per day for violations occurring between January 12, 2009, and November 2, 2015; and up to $54,833 per day for violations occurring after November 2, 2015, and assessed on or after February 6, 2019.  33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

## <u>VIOLATIONS OF THE CWA BY FORD AND THE FORD COMPANIES</u>

## I.    **Ford and the Ford Companies Discharged Fill Into Jurisdictional Wetlands and Streams Without a Permit**

### A.    *Defendants Filled Jurisdictional Wetlands and Rerouted a Stream at the Slaughter Road Site*

#### i.    The Site

38.     The Mark Ford Training Center is located at 90 Slaughter Road, in the Town of Wallkill in Orange County, New York ("Slaughter Road Site").  Defendants Mark Ford Stage

Road Property, Inc., and Ford Equine, Ltd., are the owners of the Slaughter Road Site, and defendant Mark Ford Stables, Inc., is engaged in the business of training and racing harness horses on the Slaughter Road Site.

39.    Defendant Ford is the president and sole shareholder of defendants Mark Ford Stage Road Property, Inc., Mark Ford Stables, Inc., and Ford Equine, Ltd., and at all times relevant to this complaint, controlled the Slaughter Road Site and all activities relevant to this complaint that occurred on the Slaughter Road Site.

40.    The Slaughter Road Site covers approximately 75.8 acres. Crystal Run Creek flows southward through the middle of the site.

41.    Crystal Run Creek is a perennial tributary of the Wallkill River that has physical indicators of an ordinary high water mark, including bed and banks. In 2016, after the construction activities described in paragraphs 54 to 60,  EPA confirmed that the portions of the creek that were upstream of the disturbed site had perennial flow, an ordinary high water mark, including defined bed and banks, substrate sorting, and fish, benthic algae, and macroinvertebrates associated with perennial flow conditions. Crystal Run Creek flows southward from the site approximately one mile to the Wallkill River.

42.    The Wallkill River flows approximately 42.3 miles northeast to Rondout Creek, a major tributary of the Hudson River. The United States Fish and Wildlife Service publicizes self-guided kayak and canoeing activities on the Wallkill River within the Wallkill River National Wildlife Refuge, which is situated in Orange County, New York, and Sussex County, New

Jersey. Several car-top boat launches are also situated at various locations along the Wallkill River.

### ii.    Ford Is on Notice of Jurisdictional Wetlands

43.    In 1994, the then-owner of the Slaughter Road Site, Russell Triolo ("Triolo"), through his consultant, North Country Ecological Services ("North Country"), asked the Corps of Engineers for a wetlands jurisdictional determination on the Slaughter Road Site.

44.    In a jurisdictional determination dated June 30, 1995 ("1995 Jurisdictional Determination"), which was based on a 1993 wetland delineation by North Country, the Corps of Engineers observed that there were four wetland areas on the subject property, which totaled 25.34 acres of jurisdictional wetlands.

45.    According to the 1995 Jurisdictional Determination, the first wetland area ("Area A") was located along the northern property line and contained approximately 5.24 acres within the property boundary.  The second wetland ("Area B") was located in the central portion of the property and was approximately 0.55 acres.  The third wetland ("Area C") was located on the eastern portion of the property and was approximately 12.08 acres within the property boundary.  The fourth wetland ("Area D") ran through the middle of the property and included a pond and "an unnamed tributary to the Wallkill River" (*i.e.*, Crystal Run Creek), and was approximately 7.47 acres. The wetland Areas A, B, C and D, which totaled approximately 25.34 acres, abutted Crystal Run Creek.

46.    As a result of the 1995 Jurisdictional Determination, Triolo abandoned his plans to develop the Slaughter Road Site into an industrial park.

47.    In April 2007, Triolo sold his property to defendant Mark Ford Stage Road Property, Inc.

48.     Beginning in the spring of 2007, defendant Ford commenced extensive construction at the Slaughter Road Site.

49.     In May and June of 2007, the Site was evaluated by defendant Ford's environmental consultants, Robert Torgerson and Peter Torgerson (collectively, "Torgerson"). Torgerson acted as Ford's agent for the purpose of this evaluation.

50.     At the time that it performed its evaluation, Torgerson had a copy of the 1995 Jurisdictional Determination.

51.     Torgerson documented the conclusions of its evaluation in a July 30, 2007 report titled "Habitat Site Investigation and Report—Horse Training Facility—Mark S. Ford Stables, Inc." ("2007 Torgerson Report").

52.     According to the 2007 Torgerson Report, the Slaughter Road Site had 19.6 acres of wetlands and a 1.188-acre pond in the center of the site.

53.     Crystal Run Creek and the four wetland areas within the Slaughter Road Site, as identified in the 1995 Jurisdictional Determination, are "waters of the United States" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

### iii.     Ford Fills in Jurisdictional Wetlands Identified by His Contractors

54.     Despite being on notice of jurisdictional wetlands at the Slaughter Road Site, as described in both the 1995 Jurisdictional Determination (which at a minimum Ford's agent Torgerson had in hand) and the 2007 Torgerson Report, and without first obtaining a permit, defendant Ford conducted, contracted for, supervised and/or otherwise controlled extensive construction work at the Slaughter Road Site, and used mechanized land clearing and filling equipment to fill in approximately 24 acres of the jurisdictional wetlands in or around 2007.

55.     Defendant Ford also conducted, contracted for, supervised and/or otherwise controlled the straightening of significant portions of Crystal Run Creek on the northern half of the Slaughter Road Site without first obtaining a federal permit.  Specifically, in 2007, Ford caused roughly 310 linear feet of creek bed along Crystal Run Creek to be straightened using mechanized filling equipment.  Also, in 2007, defendant Ford discharged approximately 150 linear feet of loose stone associated with the construction of the track bridges along Crystal Run Creek below the ordinary high water mark.

56.     In 2008, defendant Ford opened the Mark Ford Training Center as a 76-acre facility for harness racing horses.

57.     In a 2010 magazine interview, defendant Ford asserted that he moved "hundreds of thousands of yards of dirt" to build his horse training center at the Slaughter Road Site, and boasted that "[t]here's not been a square inch of that acreage that a bulldozer hasn't been across."

58.     Construction work at the Slaughter Road Site continued from 2011 through 2013.  During that time, defendant Ford caused roughly an additional 1,460 linear feet of creek bed along Crystal Run Creek to be straightened without first obtaining a federal permit.

59.     Aerial imagery of the Slaughter Road Site shows that in 2013, the original channel of Crystal Run Creek was completely backfilled.  On information and belief, the original channel was filled with imported dirt and rocks and other waste material from a local highway project.

60.     Defendant Ford and the Ford Companies never sought or obtained authorization from the Corps of Engineers for the filling of these jurisdictional wetlands and the rerouting and filling of Crystal Run Creek.

**B.**     ***Defendants Filled Jurisdictional Wetlands and Straightened Streams at the Ford Equine Site***

61.     The Ford Equine Site covers approximately 86.4 acres, and is located at 482/484 Stony Ford Road in the Town of Wallkill in Orange County, New York.

62.     In September 2014, defendant Ford Equine, Ltd. purchased the Ford Equine Site for the purpose of expanding the horse training facility.  At all times relevant to this complaint thereafter, defendant Ford controlled the Ford Equine Site and all activities relevant to this complaint that occurred on the Ford Equine Site.

63.     When defendant Ford Equine, Ltd. acquired the Ford Equine Site, a stream (the "Ford Equine Site Stream") flowed southward through the eastern portion of the site.

64.     The Ford Equine Site Stream is a perennial tributary of the Wallkill River that has physical indicators of an ordinary high water mark, including bed and banks.  In 2016, after the construction activities described in paragraphs 67 through 69, EPA confirmed that the portions of the Ford Equine Site Stream that were upstream of the disturbed site had perennial flow, an ordinary high water mark, including defined bed and banks, substrate sorting, and fish, benthic algae, and macroinvertebrates associated with perennial flow conditions.  The Ford Equine Site Stream flows southward from the site approximately 3,300 feet to the Wallkill River.

65.     When defendant Ford Equine, Ltd. acquired the Ford Equine Site, the site had four wetland areas, one of which ("Wetland A," a jurisdictional wetland) abutted the Ford Equine Site Stream. In 2016, after the construction activities described in paragraphs 67 through 69, NYSDEC excavated and sampled 21 pits in the eastern portion of the site in order to characterize the soils beneath the fill material that has been placed there. NYSDEC determined that in some of the test pits, the soils beneath the fill material were saturated with groundwater, indicating that potential wetland hydrology was present in those locations before the construction

activities.  Based on evidence that included NYSDEC's findings and pre-2016 satellite imagery, Wetland A comprised approximately 2.27 acres before defendant Ford's construction activities.

66.     The Ford Equine Site Stream and Wetland A at the Ford Equine Site are "waters of the United States" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

67.     Beginning in spring 2015 and through February 2016, Ford began extensive construction work on the Ford Equine Site using mechanized land clearing and filling equipment.

68.     Defendant Ford caused approximately 900 linear feet of the Ford Equine Site Stream to be filled and he rerouted the steam around the eastern corner of the Ford Equine Site. As a result of defendant Ford's construction activities, the Ford Equine Site Stream now flows southeast and then southwest along the perimeter of the Ford Equine Site before returning to its original path to the Wallkill River.

69.     Defendant Ford's construction work on the Ford Equine Site caused fill material to be discharged into most of Wetland A at the site.  The fill consisted of, among other things, construction and demolition material, brick, concrete, asphalt, dirt, stone, glass, wood, and gravel.

70.     Defendant Ford and the Ford Companies never sought or obtained authorization from the Corps of Engineers for the filling of the Ford Equine Site Stream and for Wetland A at the Ford Equine Site.

## II.     Mark Ford Stage Road Property Violated Its Construction General Permit at the Slaughter Road Site

71.     Defendants Ford and Mark Ford Stage Road Property, Inc., sought coverage under the Construction General Permit, and on or about January 19, 2016, they were authorized by NYSDEC, in accordance with SPDES Permit number NYR11A294, to discharge stormwater

from the ongoing construction activities at the Slaughter Road Site in compliance with the terms of the permit.

72.     Therefore, as of January 19, 2016, defendants Ford and Mark Ford Stage Road Property, Inc., were required to comply with the Construction General Permit—specifically, Permit No. GP-0-15-002—until all construction activities at the Slaughter Road Site were completed and NYSDEC had approved a request to terminate coverage.

73.     On November 29, 2016, EPA conducted an inspection at the Slaughter Road Site to determine whether defendants Ford and Mark Ford Stage Road Property, Inc., were in compliance with the Construction General Permit.  EPA identified several areas of noncompliance.

74.     First, EPA observed unstabilized stockpiles of soil and mulch in the southwest portion of the Slaughter Road Site that lacked the erosion and sediment controls required by Part I.B.1.a of the Construction General Permit, thereby causing runoff from the piles and other unstabilized areas of the construction site to flow into Crystal Run Creek.

75.     Second, EPA observed several areas of the Slaughter Road Site where a lack of erosion or sediment controls caused turbid stormwater to flow into a catch basin and ditch/stream tributaries in the southwest portion of the site that, in turn, flowed into Crystal Run Creek, causing deposition or impairing the waters' best uses, in violation of Parts I.B.1, I.D.1, and I.D.2 of the Construction General Permit.

76.     Third, EPA determined that from February 2016—when defendants Ford and Mark Stage Road Property, Inc., notified the Town of Wallkill that it would commence conducting monthly inspections of the construction site—to February 2017, defendants Ford and

Mark Stage Road Property, Inc., failed to conduct the monthly inspections required by Part IV.C.2.c of the Construction General Permit.

77.     On or around January 26, 2018, defendants Ford and Mark Ford Stage Road Property, Inc., through their consultant, submitted a Notice of Termination of the Construction General Permit to NYSDEC, which NYSDEC approved on or about January 30, 2018. Accordingly, while defendants Ford and Mark Ford Stage Road Property, Inc. are no longer required to abide by the Construction General Permit, they are liable for civil penalties for their violations of that permit through January 30, 2018.

### III.    Ford Discharged Animal Waste and Cleaning Agents Into Waters of the United States

78.     The Slaughter Road Site contains an operating horse training facility and stables, and has six horse barns, three manure barns, a shop, a storage barn, and a training oval.

79.     The Slaughter Road Site can house up to 330 horses at any one time.

80.     Barns 1, 2, 3, 4, and 6 at the Slaughter Road Site each have four wash bays used for daily horse cleaning that are clustered in the center of each barn.  Barn 5 has two wash bays, one on each side in the barn, as well as a swimming pool for horses in the center of the barn. The wash water from the wash bays and the swimming pool water are discharged to a green pipe behind and to the northeast of Barn 5.  This pipe discharges to a 625-foot long ditch, which connects to Crystal Run Creek.

81.     The three manure barns at the Slaughter Road Site are used to store manure and bedding from the barns, and to store clean sawdust from the Slaughter Road Site.  Catch basins in close proximity to the three manure barns discharge to a black corrugated pipe, which in turn discharges to a ditch in the northeastern portion of the Slaughter Road Site.  The ditch discharges to Crystal Run Creek.

82.     The Slaughter Road Site composts some of the manure from the three manure barns for future use as topsoil, and has a compost pile on the premises.  The compost pile is on a sloped hillside to the east of the storage barn, which is on the southeast side of the Slaughter Road Site, and up-gradient of a catch basin that discharges to the southern portion of the Slaughter Road Site.

83.     The Slaughter Road Site also has approximately 25 paddocks where horses are kept or exercised.  Catch basins in the paddocks and in the adjoining areas on the northern portion of the Slaughter Road Site discharge to the same black corrugated pipe near the three manure barns.  The pipe discharges to the ditch in the northeastern portion of the Slaughter Road Site which, in turn, discharges to Crystal Run Creek.

84.     The adjacent Ford Equine Site has a dirt track, some small barns, and parking areas south of the dirt track.

85.     The Ford Equine Site also has a compost pile.  The majority of the composted manure occurs on the Slaughter Road Site, while any excess manure is taken to the Ford Equine Site.  The sites use a common system for the disposal of waste.

86.     The Ford Equine Site has a barn (the "Stony Ford Barn") with one wash stall that discharges wash water to an adjacent field to the east of the Stony Ford Barn.  The Ford Equine Site Stream runs behind and parallel to the tree line adjacent to the field.

87.     On December 12, 2016, EPA conducted a CAFO inspection ("CAFO Inspection") at the Slaughter Road Site and the Ford Equine Site.

88.     At the time of the CAFO Inspection, approximately 257 horses were stabled and fed or maintained at the Slaughter Road Site, and seven horses were stabled at the Ford Equine Site.  In addition, the Ford Equine Site had a cow barn that housed approximately 18 cows.

89.     At the Slaughter Road Site, the horse wash water from the wash bays and/or stalls at Barns 1, 2, 3, 4, 5, and 6, as well as the water discharged from the horse swimming pool in Barn 5, flow through a pipe that discharges to a man-made ditch that discharges, in turn, to Crystal Run Creek.

90.     The EPA inspector observed that the wash bay area of Barn 5 had a white container labeled "ORVUS WA Paste," which is a shampoo used to wash horses.  ORVUS is a synthetic surfactant and wetting agent.

91.     The EPA inspector further observed a considerable amount of manure stored in uncovered areas outside each of the three manure barns at the Slaughter Road Site.  The manure was exposed to precipitation and had not been removed from those areas for five weeks before the CAFO Inspection.

92.     The EPA inspector observed catch basins located close to each of the three manure barns at the Slaughter Road Site.  The catch basins discharge to a black corrugated pipe, which, in turn, discharges to a ditch in the northeast portion of the Site.  The ditch flows into Crystal Run Creek.

93.     The EPA inspector also observed turbid flow entering the catch basin close to the second manure barn at the Slaughter Road Site.  Inside the catch basin near the third manure barn at the Slaughter Road Site, the EPA inspector observed built-up sediments, hay, and foaming in the top portion of the catch basin.

94.     The Slaughter Road Site and the Ford Equine Site together constitute a "medium" CAFO, as that term is defined under 40 C.F.R. §§ 122.23(b)(2) and 122.23(b)(6), because (1) at the time of the CAFO Inspection, approximately 257 horses were stabled and fed or maintained at both sites; (2) manure from the Slaughter Road Site and the Ford Equine Site use a common

area or system for the disposal of wastes; and (3) wash water from horse wash bays and stalls in Barns 1-6 and from the horse swimming pool in Barn 5 at the Slaughter Road Site is discharged to waters of the United States through a man-made ditch that discharges into Crystal Run Creek.

95.     On June 8, 2017, EPA sent defendant Ford an inspection report and directed Ford and the Ford Companies to stop the discharge of wash water and swimming pool water from the Slaughter Road Site; ensure that runoff from the manure barns is contained and does not flow into waters of the United States; cover any piles of manure being temporarily stored outside of barns; and obtain a CAFO permit from NYSDEC.  To date, Ford and the Ford Companies have not ceased these activities and have not obtained coverage under a CAFO Individual Permit or a CAFO General Permit.

## FIRST CLAIM FOR RELIEF

### *Unpermitted Discharges of Fill Into Jurisdictional Wetlands and Streams* (33 U.S.C. § 1311(a))

96.     The United States repeats and realleges the allegations set forth in Paragraphs 1 through 95.

97.     Beginning in 2008 and continuing at least through September 2013, Ford and the Ford Companies and/or persons acting on their behalf, or with their consent and/or knowledge, used mechanized land-clearing and filling equipment to discharge fill material into jurisdictional wetlands and a tributary that are waters of the United States, at the Slaughter Road Site.

98.     Beginning in 2015 and continuing at least through February 2016, Ford and defendant Ford Equine, Ltd., and/or persons acting on their behalf, or with their consent and/or knowledge, used mechanized land-clearing and filling equipment to discharge fill material into jurisdictional wetlands and a tributary that are waters of the United States, at the Ford Equine Site.

99.     The mechanized land-clearing and filling equipment used by Ford and the Ford Companies to discharge fill material into jurisdictional wetlands and tributaries at the Slaughter Road Site and Ford Equine Site that are waters of the United States constituted "point sources," as defined in Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

100.    The discharges of fill material included, among other things, dirt, rock, and earthen material, all of which constitute "pollutants" as defined in Section 502(6) of the CWA, 33 U.S.C. § 1362(6).

101.    The discharges of fill material constituted discharges of a pollutant within the meaning of Section 301 of the CWA, 33 U.S.C. § 1311, and Section 502(12) of the CWA, 33 U.S.C. § 1362(12).

102.    Ford and the Ford Companies did not obtain a permit under Section 404 of the CWA, 33 U.S.C. § 1344, for the discharges of fill material into waters of the United States as required by Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

103.    Accordingly, these discharges of fill to navigable waters violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

104.    The fill discharged by Ford and the Ford Companies into these waters of the United States remains in place, in continuing violation of the statute.

105.    Ford and the Ford Companies are liable for civil penalties for each day of each violation at the Slaughter Road Site.

106.    Ford and defendant Ford Equine Ltd., are liable for civil penalties for each day of each violation at the Ford Equine Site.

107.    Unless enjoined by an Order of Court, Ford and the Ford Companies are likely to continue to leave the unlawfully discharged fill in place in waters of the United States.

## SECOND CLAIM FOR RELIEF

### *Violation of Construction General Permit*
### (33 U.S.C. § 1342)

108.     The United States repeats and realleges the allegations set forth in Paragraphs 1 through 107.

109.     From November 29, 2016, to January 30, 2018, defendants Ford and Mark Ford Stage Road Property, Inc. were required to comply with the Construction General Permit.

110.     During that same period, defendants Ford and Mark Ford Stage Road Property, Inc. failed to stabilize stockpiles of soil and mulch and failed to maintain erosion and sediment controls on the Slaughter Road Site, in violation of the terms and conditions of the Construction General Permit issued under Section 402 of the CWA, 33 U.S.C. § 1342.

111.     During that same period, defendants Ford and Mark Ford Stage Road Property, Inc. (a) failed to maintain copies of its Stormwater Pollution Prevention Plan and (b) failed to conduct monthly inspections of the Slaughter Road Site from February 2016 to February 2017, in violation of the terms and conditions of the Construction General Permit issued under Section 402 of the CWA, 33 U.S.C. § 1342.

112.      Defendants Ford and Mark Ford Stage Road Property are liable for civil penalties under CWA Section 309(d), 33 U.S.C. § 1319(d), for each day of each violation.

## THIRD CLAIM FOR RELIEF

### *Unauthorized Discharges of Pollutants from*
### *Concentrated Animal Feeding Operation and Other Point Sources*
### (33 U.S.C. § 1311(a))

113.     The United States repeats and realleges the allegations set forth in Paragraphs 1 through 112.

114.     From at least December 12, 2016, to the present, Ford and the Ford Companies have discharged pollutants from the Slaughter Road Site and the Ford Equine Site to waters of the United States, within the meaning of CWA Section 502(7), 33 U.S.C. § 1362(7).

115.     From at least December 12, 2016, to the present, the Slaughter Road Site and the Ford Equine Site have constituted a medium CAFO within the meaning of 40 C.F.R. § 122.23(b)(6).  This CAFO is a "point source" within the meaning of Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

116.     Additionally, certain of these discharges are from pipes and ditches, which themselves are point sources within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

117.     From at least December 12, 2016, to the present, Ford and the Ford Companies have failed to obtain coverage under a CAFO Individual Permit or a CAFO General Permit for the Slaughter Road Site and the Ford Equine Site, nor have they obtained permit coverage authorizing the discharge from pipes and ditches.

118.     Ford and the Ford Companies discharge process wastewater to navigable waters each day that horses are washed in Barns 1-6 and are taken into the horse swimming pool in Barn 5 at the Slaughter Road Site, in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).  Upon information and belief, horses are washed and/or use the horse swimming pool at the Slaughter Road Site on a daily basis.

119.     In addition, from December 12, 2016, through May 16, 2017, during rainfall events resulting in at least one inch of rain ("Significant Rainfall Event"), Ford and the Ford Companies discharged process wastewater from the uncovered manure stored outside each of the three manure barns at the Slaughter Road Site through nearby catch basins.  The catch basins

discharged to a black corrugated pipe, which in turn, discharged to a ditch in the northeastern portion of the Slaughter Road Site, which discharged to Crystal Run Creek.

120.     From December 12, 2016, through May 16, 2017, there were four Significant Rainfall Events at the Facility.

121.     Each discharge of process wastewater described herein is a "discharge of pollutants" within the meaning of Section 502(12) of the CWA, 33 U.S.C. § 1362(12).

122.     Each day of the unauthorized discharge of a pollutant to navigable waters without a permit is a separate violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

123.     Ford and the Ford Companies are liable for civil penalties under CWA Section 309(d), 33 U.S.C. § 1319(d), for each day of each violation.

124.     Unless enjoined by an Order of Court, Ford and the Ford Companies are likely to continue discharging pollutants without a permit in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

### PRAYER FOR RELIEF

WHEREFORE, the United States of America respectfully requests that this Court:

a)     Enjoin Ford and the Ford Companies from discharging or causing the discharge of pollutants to waters of the United States, except in compliance with the CWA;

b)     Enjoin Ford and the Ford Companies to undertake measures, at their expense and at the direction of EPA, to effect restoration of the Slaughter Road Site and the Ford Equine Site;

c)     Assess civil penalties against Ford and the Ford Companies pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), for each day of each violation;

d)     Award the United States costs and disbursements in this action; and

e)     Grant the United States such other relief as the Court deems just and proper.

Dated:     October 17, 2019
           New York, New York

                              GEOFFREY S. BERMAN
                              United States Attorney for the
                              Southern District of New York


                    By:        /s/ Tomoko Onozawa
                              TOMOKO ONOZAWA
                              Assistant United States Attorney
                              86 Chambers Street, 3rd Floor
                              New York, New York 10007
                              Telephone:  (212) 637-2721
                              Facsimile: (212) 637-2686
                              E-mail:  tomoko.onozawa@usdoj.gov


                              JEFFREY BOSSERT CLARK
                              Assistant Attorney General
                              United States Department of Justice
                              Environment and Natural Resources Division


OF COUNSEL:

KARA E. MURPHY
Assistant Regional Counsel
Water and General Law Branch
United States Environmental Protection Agency
Region 2
290 Broadway, 16th Floor
New York, New York 10007