UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                               Plaintiff,<br><br>                               -v-<br><br>MARK FORD, MARK FORD STABLES, INC.,<br>MARK FORD STAGE ROAD PROPERTY, INC.,<br>and FORD EQUINE, LTD.,<br><br>                               Defendants. | 19 Civ. 9600 (PMH)<br><br>**DEFENDANTS' RESPONSES TO UNITED STATES OF AMERICA'S FIRST SET OF INTERROGATORIES AND DOCUMENT REQUESTS TO DEFENDANT** |

Defendants Mark Ford, Mark Ford Stables, Inc., Mark Ford Stage Road Property, Inc., and Ford Equine, Ltd. ("Defendants"), by and through their undersigned counsel, respond to first set of interrogatories and document requests propounded by the Plaintiff United States of America as follows:

## INTERROGATORIES

1. Identify each witness or other person with knowledge or information regarding the events alleged in the Complaint.

**Mark S. Ford, 125 Stony Ford Road, Campbell Hall, NY 10916 (973) 568-3253**

**Thomas M. DePuy, P.E., T.M. DePuy Engineering & Land Surveying P.C., 2656 Route 302, Middletown, NY 10941 (845) 361-5421**

**James Bates, Ecological Analysis, LLC, 633 Route 211 East, Suite 4, Box 4 Middletown, NY 10941 (845) 495-0123**

2. For each Corporate Defendant, identify each shareholder, director, and employee that entity between January 1, 2006, and the present.

**Mark S. Ford is the sole shareholder of each of the corporate defendants. Mark Ford Stables, Inc. is the corporate employer, and Mr. Ford has advised the**

**undersigned that he will supplement these interrogatories by supplying a list of those employees.**

3. Identify all persons with knowledge of the management (including disposal) of process wastewater at the Ford Equine and Slaughter Road Sites.

**Mark S. Ford**

**Thomas M. DePuy, P.E.**

**James Bates, Ecological Analysis, LLC**

4. Identify all documents and individuals with knowledge or information regarding the assertion in Defendants' Answer that process wastewater from manure piles, horse wash bins, stall, and swimming pools, discharge into a "dry, man-made, upland-vegetated ditch" but do not discharge into Crystal Run Creek. *See, e.g.*, Answer ¶¶ 80-81.

**DEFENDANTS OBJECT TO THE ABOVE CHARACTERIZATION OF THEIR ANSWER, WHICH IS INACCURATE. Subject to that objection, individuals who have knowledge of discharges on the property include Mark S. Ford, Thomas M. DePuy, P.E., and James Bates. During a joint site inspection held on September 17, 2020, Mr. Bates and Mr. DePuy demonstrated to EPA program staff and counsel and opposing counsel that the swimming pool contains only water (with no chemical or other additives), and is occasionally used for horses with minor injuries, during the warm months only. It is periodically drained by turning on a valve, which drains the water at varying rates of flow into the vegetated man-made drainage ditch behind the barn. This swimming pool water is not discharged into Crystal Run Creek. Regarding the discharges of wash water from the wash bays in the barns, they demonstrated and clarified that that wash water that wash water (containing shampoo and water from a garden hose used to rinse the horses) from the wash bays in each barn is discharged into septic fields in front of the barns. This wash water is not discharged**

into Crystal Run Creek. There are no known owners' manuals or other documents; Mr. DePuy did not prepare drawings of the septic systems in front of the barns, and he thinks the construction contractor put them in when the barns were built in 2007.

5. Identify each individual with knowledge of the number of horses stabled at the Ford Equine Site and Slaughter Road Site and all documents reflecting the number of horses stabled at the Sites between January 1, 2006, and the present.

**Mark S. Ford**

Mr. Ford has advised the undersigned that there are no separate documents that show the exact number of horses present at Mark Ford Stables at any given time, because these horses come and go, sometimes frequently. He has therefore provided the summary below, showing the average number of horses stabled for the years 2014-2020, using yearly stall rent revenues, divided by twelve months, factored by the monthly stall rent of $750 per horse. Also included in these averages are the number of his own horses:

2020   $854,348 divided by $750 = 1,139 divided by 12 = 95 horses per month
        Mark Ford horses 20 = 115 TOTAL HORSES PER MONTH

2019   $987,811 divided by $750 = 1,317 divided by 12 = 109 horses per month
        Mark Ford horses 30 = 139 TOTAL HORSES PER MONTH

2018   $976,814 divided by $750 = 1,302 divided by 12 = 108 horses per month
        Mark Ford horses 27 = 135 TOTAL HORSES PER MONTH

2017   $917,875 divided by $750 = 1,223 divided by 12 = 102 horses per month
        Mark Ford horses 26 = 128 TOTAL HORSES PER MONTH

2016   $803,226 divided by $750 = 1,070 divided by 12 = 89 horses per month
        Mark Ford horses 30 = 119 TOTAL HORSES PER MONTH

2015   $1,167,326 divided by $750 = 1,556 divided by 12 = 130 horses per month
        Mark Ford horses 22 = 152 TOTAL HORSES PER MONTH

2014   $988,730 divided by $750 = 1,318 divided by 12 = 110 horses per month
        Mark Ford horses 22 = 132 TOTAL HORSES PER MONTH

**2013 and earlier – Records are regularly purged every seven years, and the Statute of Limitations on the Government's CAFO claims under the CWA had expired in any case.**

6. Identify all individuals with knowledge of any efforts by Defendants to determine whether jurisdictional wetlands exist on the Ford Equine and Slaughter Road Sites, and all documents exchanged between Defendants and those individuals.

**Tom M. DePuy and James Bates. Their factual and expert determinations have been made based upon their knowledge of site conditions, topographical and other surveys, aerial photographs and other documents previously to the Government (in prior settlement negotiations and mediation negotiations conducted in 2020); the 2013 and 2015 SWPPPs; and documents produced by EPA, DOJ and the Corps of Engineers that are in the possession of the Government and used to prosecute the Government's claims (see Government's Initial Rule 26(a) Disclosures, subparagraph B, page 4)**

7. Identify all individuals employed by Defendants with knowledge of any communications with EPA, the Army Corps of Engineers, or NYSDEC concerning jurisdictional wetlands on the Ford Equine and Slaughter Road Sites, and all communications exchanged between those individuals and these government entities concerning this issue.

**Thomas M. DePuy, James Bates, and possibly Peter Torgersen and Robert Torgersen. Upon information and belief, the Torgersens submitted their 2007 Habitat Assessment Report as notice for a Nationwide Permit, but no documents exist from 2007.**

8. Identify all individuals and corporate entities with knowledge of construction work that impacted Crystal Run Creek and its adjacent wetlands at the Slaughter Road Site between 2007 and 2011. **Mark S. Ford**

9. Identify all individuals and corporate entities with knowledge of the construction work that impacted the Ford Equine Site Stream and its adjacent wetlands at the Ford Equine Site during or around 2016. **Mark S. Ford, Thomas M. DePuy and James Bates**

4

10. Identify all individuals and corporate entities with knowledge the "emergency repair work" referenced in Paragraph 58 of the Answer and all documents and communications related to that work.  **Mark S. Ford, Thomas M. DePuy**

11. Identify all individuals with knowledge of any efforts by Defendants' to comply with the Construction General Permit issued by NYSDEC. **Thomas M. DePuy**

12. Identify all individuals with knowledge of the implementation of remedial measures after the EPA inspection on November 29, 2016, to achieve or maintain compliance with the Construction General Permit.  **Thomas M. DePuy**

13. Identify all individuals with knowledge regarding bookkeeping, financial management, and accounting at the Corporate Defendants.

**Mark S. Ford**
**Michelle Smith, Bookkeeper,125 Stony Ford Road, Middletown, NY 10916 (845) 294-1499**
**Allen Lamberg, Lamberg Consultants, Ltd., P.O. Box 500, Jericho, NY 11753**
**(516) 931-3133**

14. Identify all computer programs and databases relied upon by Defendants for bookkeeping, financial management, and accounting, including all computer programs and databases in which Defendants maintain financial records**. Mr. Ford has advised the undersigned that he will provide the names of the requested software for his businesses.**

15. Identify all bank accounts held, controlled, and/or used by Defendants.

**This banking information, reflected in the Defendants' Federal income tax returns, was provided to the Government in Defendants' Initial Inability-to-Pay submissions submitted in July 2019 and supplemented during mediation in June and July 2020.**

16. Identify all credit card accounts, lines of credit, letters of credit, debentures, or other debt facilities used by Defendants.

**See answer to No. 15; Defendants' credit lines and debt structures were fully documented in their July 2019 and June 2020 inability-to-pay submissions.**

# REQUEST FOR DOCUMENTS

1. All documents that are referred to, relate to, or are identified in Defendant's responses to the Interrogatories above.

2. All documents that depict the Corporate Defendants' corporate structure and/or organization for each of the years 2006 through the present.

**See the attached Certificates of Incorporations for Mark Ford Stables, Inc.; Mark Ford Stage Road Property, Inc.; Ford Equine, Ltd. and related corporate documents.**

3. All documents and communications exchanged between EPA or any local, county, or state environmental regulatory authority and Defendants, or Defendants' contractors, related to the Ford Equine or Slaughter Road Sites, including documents and communications concerning process wastewater discharges.

**See Answers to Interrogatory Nos. 4 and 6.**

4. All documents and communications related to the acquisition of the Ford Equine and Slaughter Road Sites, including all communications between Defendants and the sellers of the properties.

**See attached closing statements for Mark Ford Stage Road Property, Inc. and Ford Equine Ltd.**

5. All documents and communications that refer or relate to *Bayack, et al. v. Mark Ford, et al.*, Index No. EF000348-2020 (N.Y. Sup. 2020), including all pleadings, motions, discovery, and other filings.

**See attached copies of Complaint and Answer**

6. All documents showing the number of horses stabled at the Ford Equine and Slaughter Road Site from January 1, 2006, to the present.

> See Answer to Interrogatory No. 5.

7. All documents and communications that refer or relate to the discharge of pollutants from Ford Equine and Slaughter Road Site into Crystal Run Creek or the Ford Equine Site Stream.

**None. Defendants do not charge any pollutants (or anything else) into Crystal Run Creek or the Ford Equine Site Stream.**

8. All documents and communications that refer or relate to Defendants' management of process wastewater at the Ford Equine and Slaughter Road Sites, including documents sufficient to show each location in which process wastewater is disposed.

**None. There is no "process wastewater" to be managed on the defendants' properties.**

9. All documents and communications that refer or relate to the hydrological connectivity of the "dry, man-made, upland-vegetated ditch," Answer ¶ 80, into which Defendants' discharge process wastewater and Crystal Run Creek.

**None. See Objection and Answers to Interrogatories Nos. 4 and 6.**

10. All documents and communications related to the storage of manure on the Ford Equine and Slaughter Road Sites.

**Used stable bedding (consisting of 90% bedding and 10% manure) is removed when the stalls are cleaned out, then stored under covered barns. It remains there until local farmers come to take if off-site, to make compost for their own use or for sale. There are no documents reflecting this common practice. (Note: there is no land spreading of manure on the properties).**

11. All documents and communications exchanged between Defendants and any contractors, third parties, or local, state or federal regulators that refer or relate to the existence of jurisdictional wetlands on the Slaughter Road and Ford Equine Site, including all documents and

communications related to the July 30, 2007 report titled "Habitat Site and Investigation Report—Horse Training Facility—Mark S. Ford Stables, Inc." and the June 30, 1995 jurisdictional determination issued by the Army Corps of Engineers.

**Documents from 2007, if any existed, would have been purged in the regular course of business. See also Answer to Interrogatory No. 6.**

12. All documents and communications exchanged between Defendants and Robert and Peter Torgerson.

**The Defendants' records are routinely purged every seven years. If there were any records, they are no longer kept.**

13. All documents and communications exchanged between Defendants and the Army Corps of Engineers.

**None.**

**14.** All documents and communications related to construction work undertaken during or around 2007 or during or around 2011 on the Slaughter Road Site that resulted in the discharge of fill into wetlands on the property and the discharge of fill into and channelization and straightening of Crystal Run Creek. **The Defendants' records are routinely purged every seven years. If there were any records, they are no longer kept.**

15. All documents and communications that relate or refer to the 2016 excavation and sampling performed by NYSDEC on the Ford Equine Site that revealed that, in some areas, soil beneath fill material was saturated with groundwater.

**None. Thomas DePuy may have documents on this subject.**

16. All documents and communications related to construction work undertaken in 2015 and 2016 on the Ford Equine Site that resulted in the discharge of fill into wetlands on the property and the discharge of fill into the channelization and straightening of the Ford Equine Site Stream. **The 2013 and 2015 SWPPPs, which have been produced to the Government. Thomas DePuy may have other records.**

17. All documents and communications related to the hydrological connectivity of wetlands on the Slaughter Road Site to Crystal Run Creek and of Crystal Run Creek to the Walkill River.

**None. Thomas DePuy and Jim Bates may have documents on this.**

18. All documents and communications related to the hydrological connectivity of the wetlands on the Ford Equine Site to the Ford Equine Site Stream and of the Ford Equine Site Stream to the Walkill River.

**None. Thomas DePuy and Jim Bates may have some documents on this.**

19. All documents and communications, including but not limited to inspection reports, notices of violation, orders, consent orders, and related correspondence with any local, state, or federal agency, that refer or relate to Defendants' compliance with the Construction General Permit since January 1, 2015. **None. Thomas DePuy was handling the Construction General Permit and has documents on this**.

20. All inspection reports required by Part IV.C.2.c of the Construction General Permit. **None. Thomas DePuy was handling the Construction General Permit and may have documents on this.**

21. All documents and communications, including but not limited to diagrams, engineering

surveys, blueprints, and as-built plans, that refer or relate to remedial measures implemented since the EPA inspection on November 29, 2016, to achieve or maintain compliance with the Construction General Permit. **None. Thomas DePuy was handling the Construction General Permit and may have documents on this.**

22. All documents that refer or relate to any transfer of funds from or loans issued by Defendant Mark Ford to the Corporate Defendants.

**See attached copies of Closing Statements.**

Annual statements for all banking, investment, retirement or any other accounts held by Defendants for the years 2014 to 2019. Monthly statements for banking, investment, retirement or any other accounts held by Defendants for each month from January 2020 to the present. **Defendants' banking information, reflected on their Federal income tax returns, was provided to the Government and also reflected in Defendants' Initial Inability-to-Pay submissions submitted in July 2019 and supplemented during mediation in June and July 2020.**

Dated: February 15, 2021
Shelter Island, New York

**WESTERVELT & REA LLP**

By:___/*Kimberlea Shaw Rea*__
Kimberlea Shaw Rea
50 North Ferry Road
P.O. Box 633
Shelter Island, New York 11964
kimberlearea@gmail.com
*Attorneys for Defendants*

# CERTIFICATE OF SERVICE

I, hereby certify that the Defendants' Responses to the First Set of Interrogatories and Document Requests were served on February 15, 2021 by electronic mail upon the following:

>Zachary Bannon
>Tomoko Onozawa
>Assistant United States Attorneys
>86 Chambers Street, 3rd Floor
>New York, New York 10006
>Tel.:(212) 537-2728, 2721
>Fax:(212) 637-2717
>E-mail: Zachary.Bannon@usdoj.gov
>Tomoko.Onozawa@usdoj.gov

Dated: February 15, 2021
Shelter Island, New York 11964

## WESTERVELT & REA LLP

>By:___/*Kimberlea Shaw Rea*___
>Kimberlea Shaw Rea
>50 North Ferry Road
>P.O. Box 633
>Shelter Island, New York 11964
>kimberlearea@gmail.com
>*Attorneys for Defendants*